UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PETE RUSSELL, §
§
     Petitioner, §
VS. § CIVIL ACTION NO. 4:13-CV-3636
§
LORIE DAVIS, §
§
     Respondent. §

## MEMORANDUM AND ORDER DENYING
## PETITION FOR A WRIT OF HABEAS CORPUS

Pete Russell, Jr., has been on Texas' death row since 2003 for the capital murder of Tanjala Brewer. After unsuccessfully challenging his conviction and sentence on state appellate and habeas review, Russell petitions for federal habeas corpus relief. (Docket Entry No. 37). Respondent Lorie Davis has filed an answer and moved for summary judgment. (Docket Entry No. 47). Traditional limitations on federal review of state court judgments guide adjudication of Russell's petition. In particular, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") defines both the scope and nature of this Court's review. Having reviewed the record, the pleadings, and the applicable law, the Court will deny Russell's federal petition. The Court will not certify any issue for appellate review.

### FACTUAL BACKGROUND

On August 13, 2001, family members found the body of forty-year-old Tanjala Brewer lying on the floor of her kitchen. Her throat had been slit and blood pooled by her neck. Her body had been posed in a spread-eagle position with her skirt raised. A crack pipe had been placed in her hand.

When first responders entered they discovered the gas on and lit candles throughout the house.  Bloody drag marks from the bedroom to the kitchen suggested that her body had been moved.  Blood pooled in Ms. Brewer's bed and was spattered across the headboard.  A machete was lying nearby.  Someone had apparently written on the bedroom mirror with blood.  The words: "She is a devil.  I am God" had also been scrawled across the closet doors in blood.

An autopsy counted twenty-three sharp-force injuries on Ms. Brewer's hands, neck, and torso.  One stab wound had penetrated at least seven inches into her left breast.  Hemorrhaging in her eye suggested that she had suffered asphyxiation.  Footprints indicated that the assailant had stomped on her legs and stomach.

## I.      The Prosecution

The police quickly identified Russell as a suspect.  A witness, in fact, had seen Russell watching first responders from across the street as they investigated the grizzly scene.  The police located Russell a few days later at a motel.  When the police entered his room, a pornographic movie was playing on the television and the bathroom door was closed.  The police opened the door to find Russell in the bathtub, foaming at the mouth and holding a bottle of rat poison.

The police subsequently recorded two oral statements, both of which served as the basis for charging Russell with capital murder.  Under Texas law, "the gravamen of capital murder is intentionally (or knowingly) causing a death, plus any one of various different types of aggravating elements."  *Gardner v. State*, 306 S.W.3d 274, 302 (Tex. Crim. App. 2009).  In the subsequent trial, the defense did not dispute that Russell had murdered Ms. Brewer.[1]  In fact, trial counsel told jurors in closing: "From day one, we have never tried to hide the ball from you.  The

---

[1]      Under Texas state law, "[a] person commits murder . . . if he intentionally or knowingly causes the death of an individual."  Tex. Penal Code § 19.02(b)(1).

issue in this case is not who did it. It has never been who did it. It has always been why." Tr. Vol. 18 at 17. The defense focused its efforts on disproving the aggravator that made the killing a capital crime.

The State of Texas charged Russell with capital murder "in the course of committing or attempting to commit . . . obstruction or retaliation" under Tex. Penal Code § 19.03(a)(2). To secure a conviction, the State had to prove that Russell murdered the victim in retaliation, that is, he "intentionally or knowingly harm[ed] or threaten[ed] to harm another . . . : (1) in retaliation for or on account of the service or status of another as a . . . person who has reported or who the actor knows intends to report the occurrence of a crime; or . . . to prevent or delay the service of another as a . . . person who has reported or who the actor knows intends to report the occurrence of a crime." Tex. Penal Code § 36.06(a); Clerk's Record at 350. The State of Texas argued that Russell killed Ms. Brewer because she had informed the police of his drug dealing; the defense argued that he slashed and stabbed her in a jealous rage. Both versions of the murder sprang from statements Russell made to the police in the hospital.

## II.    Russell's Statements

Houston Police Department Sergeant Hal Kennedy arrested Russell after finding him in the motel. Tr. Vol. 17 at 11-14. Sergeant Kennedy obtained an audiotaped statement in the hospital emergency room. Russell waived his rights and agreed to speak with the police officers. Tr. Vol. 17 at 13-14. Sergeant Kennedy asked Russell to tell "[i]n [his] own words . . . what happened and why [he] did what [he] did." Russell answered:

Russell:        She . . . she set-she set me up -- she set me up with the police.

Sgt. Kennedy: Who is she?

Russell:        Her name is [Tanjala] Bull.

Sgt. Kennedy: Okay and how did she set you up with the police?

Russell: She brought an undercover to my house saying it was her nephew, that her nephew wanted to buy some drugs, so she got out the truck, and I took her home, and about fifteen or thirty minutes later her nephew, which is the undercover, call me and I met him up there at Family Dollar -- McDonald's and that's when I got busted.

Sgt. Kennedy: Okay, but wasn't she doing some other things to you too? Wasn't she like . . .? Were y'all going together. Were y'all hanging out together?

Russell: Right. Right we use to go together.

. . .

Russell: We used to go together off of . . . I met her on the streets. I tried to take her off drugs. She was stealing from her. She had a lot of debts. I was paying them off and we were together about a year - year and a half. And then you know what I'm saying we broke up and that's when she set me up with the laws.

Sgt. Kennedy: But why did she set you up just to be mean? Or was there a purpose for it? Or . . .?

Russell: All I know cause I basically knows I left her alone and she basically had anywhere to go basically. You know.

Sgt. Kennedy: Okay ah now tell me how it is - how it is that she got killed whatever.

Russell: Basically ah I went over her house and you know since she let me in and she was smoking some drugs whatever and you know we were just talking whatever you know about the things we used to do and I was basically asking her "Why did you set me up?" "Why did you set me up?" and she kept on denying it talking bout I ain't set you up. I ain't set you up. Saying if you would have stayed with me, none of this would have happened whatever. And basically you know what I'm saying I just . . . I just went off. I just snapped.

Sgt. Kennedy: Had you been doing any drugs Pete?

Russell: No sir.

Sgt. Kennedy: Did you thing [sic] it would ever happen? Or you just . . . you just. . . why don't you tell me what happened.

Russell:     It just . . . I just happened all the while she was smokin you know what I'm saying and the last thing she said "If you would have stayed with me it would have never happened.  And the next thing I know I just snapped like that you know there was a knife on the lit dresser right there and I just grabbed it and jumped on her right there.

Sgt. Kennedy:  What kind of knife was it Was it . . .?

Russell:     A lil . . . A lil kitchen knife.

Sgt. Kennedy: What color . . .   what color was the handle?

Russell:     Black.

Sgt. Kennedy: Was that (inaudible) machete (inaudible) . . .   Anybody use the machete?     Or was that your her machete or your machete (inaudible)?

Russell:     That was her machete I remember it being in her house..

Sgt. Kennedy:  But did it have anything to do with all this?

Russell:      Naw.

Sgt. Kennedy:  What happened after - after she got killed?  What did you do?

Russell:     I basically (ah) inaudible we tussled you know what I'm saying to the ah to the kitchen or whatever.

Sgt. Kennedy: Okay.

Russell:      And Ah you know ah you know I was talking to her while she was still you know living or come dead whatever I don't know.

Sgt. Kennedy:  What you say to her?

Russell:     Know what I'm saying you know nobody didn't you know what I'm saying make me do it. Nobody to set me up and ah (inaudible) and ah I had ah turned on ah in the bedroom you know what I'm saying was lighting a cigarette . . .

Tr. Vol. 21, SX 1A at 2-4.  The next morning Russell gave another brief statement to Sgt.

Kennedy after he had been transferred to jail:

| Sgt. Kennedy: | Okay. Now what else would you like to tell us about this thing? |
|---|---|
| Russell: | I really like to say though that I'm sorry and that I really loved [the victim] and if ah I could do it all over again, It wouldn't have happened. |
| Sgt. Kennedy: | You didn't mean to kill her? |
| Russell: | No sir. |
| Sgt. Kennedy: | You lost your temper didn't you? |
| Russell: | Yes sir I just snapped and like a say I loved her, I loved the family you know what I'm saying the son and everything and If I had the chance to do it over again, I wouldn't have done it. I want her family to know that I'm sorry and her friends you know that I'm sorry and that ah I would always love her and everything. |

Tr. Vol. 22, SX 175A. Russell's statements provided the basis for the case presented by both the prosecution and the defense.

## III.    The Prosecution's Case

The State placed Russell's statement into a broader story involving Ms. Brewer's role in his conviction for selling narcotics to a police officer. Ms. Brewer was a paid confidential informant for the Houston Police Department. Ms. Brewer and Russell dated for about a year but had ended their relationship in early 2001 when he met another woman, Karen Foster. Russell and Ms. Brewer, however, continued to see each other after their romantic relationship ended.

On May 2, 2001, Ms. Brewer introduced Russell to undercover narcotics officer D. K. Bush. She told Russell that Officer Bush was her nephew and that he wanted to buy crack cocaine. A few hours later, Officer Bush called Russell and arranged to buy drugs. When Russell and Ms. Foster made the delivery, the police arrested both for delivery of a controlled substance.

Russell faced serious prison time because he had prior felony convictions. The parties dispute at what point Russell became aware that Ms. Brewer set him up. The State argued that Russell knew that Ms. Brewer was a confidential informant well before he killed her. While out on bond, Russell accompanied her to pick up payment for her services in an unrelated case. Officer Bush was surprised to see Ms. Brewer with Russell; he had warned her to keep secret her status as a confidential informant. Russell told a friend that "a lot of people in the neighborhood told him" that Ms. Brewer had turned him in. Tr. Vol. 16 at 86.

As Russell's sentencing approached, he displayed animosity toward his former girlfriend. On August 3, 2001, Ms. Brewer received a handwritten letter from Russell which stated, in part, "I cannot trust you no more. You are evil and out to hurt me. . . . I don't need you no more. So go back to your X X X X X [sic]." Tr. Vol. 16 at 48. Ms. Brewer told a friend that Russell scared her.

Russell pleaded guilty on August 9, 2001, to delivery of a controlled substance. He received a ten-year sentence. The judge gave him until September 7, 2001, to report to serve his sentence. Ms. Foster, though, remained in custody. Tr. Vol. 16 at 174.

Around this same time, Ms. Brewer began dating Wilbert Reed. Shortly before midnight on August 12, 2001, Mr. Reed stopped by Ms. Brewer's house on his way to work a night shift. They had sexual intercourse. Mr. Reed called Ms. Brewer repeatedly during his shift, but her phone was busy. Mr. Reed was angry and assumed that she had taken her phone off the hook.

Sometime after midnight, Russell came to Ms. Brewer's house. According to the State's version of events, Russell was not a jealous lover because of the victim's relationship with other men, but an angry criminal convict because of the victim's relationship with the police. The State relied on Russell's statement to argue that, in a rage of anger for his narcotics conviction,

Russell repeatedly stabbed the victim. The prosecution premised its argument on how Russell had described the killing. Russell said that he confronted the victim with having "set him up," and then he "just snapped" when she told him: "if you would have stayed with me, none of this would have happened . . . ."

Russell then dragged her body to the kitchen and placed it close to the stove. After posing the corpse, Russell turned on the gas and lit candles. The State argued that Russell hoped the house would catch on fire. The State argued that the evidence proved retaliation, not jealousy, drove Russell to kill.

## IV.    The Defense's Case

Trial counsel[2] elected to proceed with a defense also based on Russell's statement to the police. In doing so, trial counsel did not dispute Russell's identity as the killer. Instead, counsel relied on ambiguity in Russell's statement to argue that, because he did not attack Mr. Brewer in retaliation for turning him in, this was not a capital crime. Trial counsel summarized this theory in his state habeas affidavit:

> In order to rebut the element of retaliation, the defense theory of the case was that the defendant and [Tanjala] Brewer had been in a relationship but that Brewer, who used cocaine, was also involved with other men. The night of the murder, the defendant and Brewer argued with each other and the defendant snapped when Brewer pulled a knife. As the defense said in our opening statement, this was not a case of retaliation, it was a case of jilted and unfaithful love. The defendant testified to this at guilt-innocence – that he snapped when Brewer told him she had sex with another man.

State Habeas Record at 510. As trial counsel told jurors in closing arguments: "The issue of this case is not who did it. It has never been who did it. It has always been why. . .. And I think when you bring it all down, it comes down to the issues of jealousy." Tr. Vol. 18 at 17-18.

---

[2]    The trial court appointed Floyd W. Freed, III, and Ronald N. Hayes to represent Russell at trial. The Court will refer to the attorneys collectively as "trial counsel" unless necessary to identify one of the attorneys individually.

The defense, however, faced a difficult challenge in convincing jurors that the murder was the impassioned act of a rejected lover. The strongest support for the defense's case came from Russell himself. In addition to relying on his statement to the police, the defense called Russell as a witness to describe why he killed Ms. Brewer.

Consistent with the defense's chosen strategy, Russell testified that he killed Ms. Brewer in a jealous rage for flaunting another relationship in his face as she attacked him with a knife. Russell explained that he and Ms. Brewer had been dating for a "a year, a year and a half" during which time he came to trust her "very much." Tr. Vol. 17 at 89. The relationship "broke down" after Russell "got busted" for narcotics. Tr. Vol. 17 at 90. Russell claimed that, before that night, he did not know that Ms. Brewer had set him up. Tr. Vol. 17 at 117.

Russell testified that he was jealous because he thought Ms. Brewer had a relationship with Donald Ray Hawkins, a man from whom she bought drugs. Tr. Vol. 17 at 93-94. Russell felt angry about their relationship, especially after he found her alone in a motel room with Mr. Hawkins. Tr. Vol. 17 at 95. Russell did not know that Ms. Brewer was also dating Wilbert Reed, but he was suspicious about their relationship. Tr. Vol. 17 at 100.

Russell said he went to Ms. Brewer's house because she wanted him to buy her some drugs. Russell took with him a diamond ring which he had purchased with the intent of proposing marriage to her. Tr. Vol. 17 at 96-98. Soon after Russell arrived, however, they began arguing when Ms. Brewer said she was going to purchase drugs from Mr. Hawkins. As the argument intensified, Russell said that Ms. Brewer picked up a knife and confessed to relations with Mr. Hawkins. Tr. Vol 17 at 104-06, 118-119. As she came toward him, Russell became enraged, picked up a knife, and began stabbing Ms. Brewer. Tr. Vol. 17 at 106.

Russell also explained some of the bizarre elements of the crime. Russell said that, after killing Ms. Brewer he fainted and, when he came to, heard a voice saying "Tell them who I am, tell whom I am." Tr. Vol. 17 at 108, 110. He then wrote with the victim's blood on the wall. Tr. Vol. 17 at 108, 110-111. He testified that he left symbols in the crime scene: he positioned the victim's body and lit candles with the natural gas running to represent the elements of the universe. Tr. Vol. 17 at 111-13. Russell admitted that he stepped on Ms. Brewer after she was dead and placed a crack pipe in her hand., "representing the hurt . . . and her habit. This was her hell." Tr. Vol. 17 at 112-13.

Trial counsel also adduced evidence and testimony to support the chosen defense. Trial counsel elicited testimony from witnesses that Russell felt jealous toward Ms. Brewer. Tr. Vol. 16 at 37-38, 41, 86. Another witness testified that Russell showed her a ring and she told him that Ms. Brewer "wasn't going to accept it." Tr. Vol. 16 at 90-91, 94.

The State, however, disputed Russell's "long, drawn-out story about love and jealousy like this is some Shakespearean tragedy." Tr. Vol. 18 at 28. The State argued that "Karen Foster was his girlfriend at the time of this offense and there was no reason for him to be in love with or jealous about Tanjala Brewer." Tr. Vol. 18 at 30. The State rebutted testimony about the wedding ring with testimony from the officer who rode with Russell in the ambulance after his arrest. The officer testified that Russell told him: "the ring was an engagement ring and that he had bought it for [Karen Foster] and when she made bond, they were going to get married." Tr. Vol. 17 at 171. The State also adduced evidence that Russell had a picture of Ms. Foster in his wallet, but not one of the victim. The State characterized the defense's theory as twisting Russell's statements into a jealousy defense that did not reflect their relationship or the reason for which Russell committed such a brutal murder.

The jury found Russell guilty of capital murder.  Clerk's Record at 364.

## V.     The Penalty Phase

Texas law determined Russell's sentence based on the jury's answers to two special-issue

questions:

> ### SPECIAL ISSUE NO. 1
> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Pete Russell, Jr., would commit criminal acts of violence that would constitute a continuing threat to society?
>
> ### SPECIAL ISSUE NO. 2
> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Pete Russell, Jr., that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Clerk's Record at 375-76; *see also* Tex. Code Crim. Pro. 37.071 § 2(b).

The State presented testimony and evidence showing Russell's long history of

lawlessness.  In 1991, Russell was sentenced to nine years in prison for aggravated assault after

shooting a man who had been in an altercation with Russell's brother.  That same year, Russell

was convicted of aggravated robbery.  The jury also heard testimony about the conviction that

resulted from Ms. Brewer informing on Russell.  Russell was arrested for delivering drugs to a

police officer.  A subsequent search of his room revealed 17.2 grams of cocaine.  Witnesses also

described other unadjudicated offenses and bad acts committed by Russell.

During punishment the defense called ten witnesses, including both friends and family

members.  The defense's case for mitigation focused on the Russell being raised in a poor

neighborhood in which drugs and violence were common.  Russell came from a difficult

background.  His father abandoned the family and his mother had to work two jobs.  Russell was

raised in a culture of lawlessness where various family members were incarcerated. Witnesses described him as a good person who never had much of a chance.

The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.

## APPELLATE, POST-CONVICTION, AND FEDERAL REVIEW

Through appointed counsel, Russell appealed his conviction and sentence to the Texas Court of Criminal Appeals. Russell's appeal raised four issues, none of which he renews on federal habeas review.[3] On February 2, 2005, the Court of Criminal Appeals affirmed Russell's conviction and sentence in a published opinion. *Russell v. State*, 155 S.W.3d 176 (Tex. Crim. App. 2005).

During the pendency of his direct appeal, Russell filed a forty-nine page state application for a writ of habeas corpus raising three grounds for relief based on the constitutional guarantee of effective legal representation.[4] Specifically, Russell argued that defense counsel: (1) provided deficient performance in the investigation and presentation of punishment-phase evidence; (2) ineffectively selected a guilt/innocence defense, primarily by not presenting evidence that he

---

[3]     Specifically, Russell's direct appeal argued:

      1.     The trial court erred in allowing the jury to use transcripts of his recorded oral statements to assist them during deliberations.

      2.     The trial court abused its discretion by allowing a witness for the State to remain in the courtroom throughout the guilt stage of trial.

      3.     The trial court erred in permitting the State to cross-examine him during the guilt stage of trial regarding an extraneous drug offense.

      4.     The Texas death-penalty scheme is unconstitutional because it allows the application of the death penalty without providing meaningful appellate review of any of the special issues.

[4]     Russell also submitted a "Pro Se Motion for Amended Petition for State Writ of Habeas Corpus." State Habeas Record at 494. The claims in Russell's pro se application focused on arguing that trial counsel should have done more to counter the State's case for retaliation.

killed out of a sentence of rejection, and that he had previously acted violently when a relationship ended, and (3) failing to object to the State's jury argument that allegedly lessened his burden of proof. The trial court ordered trial counsel to provide an affidavit in response to Russell's claims. Trial counsel Hayes provided an affidavit responding to Russell's allegations of ineffective representation. State Habeas Record at 509-12.

The parties provided proposed findings of fact and conclusions of law addressing the issues raised by Russell's habeas application. The state court signed the State's proposed findings and conclusions without alteration and recommended that the Court of Criminal Appeals deny relief. State Habeas Record at 620-40. On November 27, 2013, the Court of Criminal Appeals "adopt[ed] the trial court's findings and conclusions," and "based upon the trial court's findings and conclusions and [its] own review, . . . den[ied] relief." *Ex parte Russell*, 2013 WL 6212211, at *1 (Tex. Crim. App. 2013).

Russell then moved for the appointment of counsel to represent him on federal habeas review. (Docket Entry No. 1). The Court appointed attorneys to represent Russell throughout the course of federal habeas review. (Docket Entry Nos. 3, 7). In 2014, Russell filed a federal petition for a writ of habeas corpus. Russell seeks habeas corpus relief based on nine claims:

(1) Insufficient evidence supports Russell's conviction for capital murder.

(2) Trial counsel provided ineffective representation by failing to argue that the State did not prove retaliation.

(3) Appellate counsel provided ineffective assistance by failing to challenge the sufficiency of the evidence.

(4) Trial counsel provided deficient performance by failing to investigate and present evidence that Russell did not kill the victim out of retaliation.

(5) The State violated *Brady v. Maryland*, by failing to produce to the defense a ring seized by the police.

(6)  The prosecutor's arguments about mitigating evidence violated Russell's constitutional rights.

(7)  Trial counsel provided deficient representation in the investigation and presentation of mitigating evidence.

(8)  Trial counsel ineffectively investigated and presented evidence that Russell would not be a future danger to society.

(9)  The state habeas court violated Russell's rights by not holding a hearing.

(Docket Entry Nos. 17, 37).[5]  Russell sought leave to amend his federal petition, but before filing his amendment moved for a stay of the proceedings under *Rhines v. Weber*, 544 U.S. 269 (2005) to exhaust several claims.  The Court stayed and administratively closed this action.  (Docket Entry No. 29).

Russell subsequently filed a motion in the Texas Court of Criminal Appeals seeking permission to litigate a successive state habeas corpus action.[6]  Under Tex. Code Crim. Pro. 11.071 § 5, Texas strictly enforces an abuse-of-the-writ doctrine that generally prohibits the filing of successive habeas applications. While article 11.071 sanctions the filing of a successive

---

[5]  Russell's initial federal petition contained eleven grounds for relief.  Russell waived two claims in his amended petition.  (Docket Entry No. 37 at 4).  The list of claims provided above only contains those claims from his amended petition.

[6]  The Court of Criminal Appeals described the claims Russell sought to litigate on successive review as follows:

> [Russell] presents nine allegations in the instant application.  He challenges the sufficiency of the evidence in Claims 1 and 2.  He asserts in Claim 3 that the prosecutor improperly argued that "personal moral culpability was equivalent to responsibility for the crime."  In Claims 4 and 5, he contends that trial counsel were ineffective for failing to argue, investigate, and prove that he did not kill the victim in the course of committing or attempting to commit retaliation. In Claim 6, [Russell] alleges that the State "might not" have disclosed an engagement ring that was seized from him at the time of his arrest.  [Russell] asserts in Claim 7 that trial counsel were ineffective for failing "to investigate and present potential evidence" that he "did not pose a future threat of danger to society." In Claims 8 and 9, he contends that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence and the prosecutor's improper jury argument on direct appeal.

*Ex parte Russell*, 2017 WL 912158, at *1 (Tex. Crim. App. 2017).

state habeas application in limited circumstances, the Court of Criminal Appeals found that Russell "failed to satisfy the requirements of Article 11.071, § 5(a)" and, thus, the state court "dismiss[ed] the application as an abuse of the writ without considering the merits of the claims." *Ex parte Russell*, 2017 WL 912158, at *1 (Tex. Crim. App. 2017).

Russell then returned to federal court. After the Court reopened this case, Russell amended his federal petition. (Docket Entry No. 37). Respondent has moved for summary judgment. (Docket Entry No. 47). Respondent argues that traditional habeas corpus jurisprudence and federal statutory law requires deference to the state court judgments in both substance and procedure. According to Respondent, Russell's failure to litigate several claims in a procedurally proper manner bars them from federal review. Respondent argues that the heavy deference afforded state court judgments precludes federal relief on the remainder of Russell's claims. Russell has filed a reply (Docket Entry No. 54) to which Respondent has filed a sur-reply (Docket Entry No. 57).

This matter is now ripe for adjudication. The Court will first discuss the procedural viability of Russell's claims before discussing whether he has met the AEDPA standards for federal habeas relief.

## PROCEDURAL REQUIREMENTS AND FEDERAL DEFERENCE

Respondent argues that federal procedural law precludes consideration of several claims. Russell raised claims one, two, three, five, six, and nine for the first time in his federal petition. This Court stayed adjudication of Russell's action to allow the exhaustion of state court remedies on those claims. The Texas Court of Criminal Appeals, however, found that Texas' abuse-of-the-writ doctrine, codified in Article 11.071 § 5(a) of the Texas Code of Criminal Appeals, barred Russell from litigating those issues in a successive state habeas application. Respondent

argues that the state-imposed procedural bar precludes federal consideration of any claim first raised in Russell's federal petition.

The procedural-bar doctrine requires inmates to litigate claims in compliance with state procedural law. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). "A federal habeas court has no power to review a state court's decision not to address a prisoner's federal claims if the state court made that decision on the basis of independent and adequate state procedural grounds." *Moses v. Davis*, 673 F. App'x 364, 367 (5th Cir. 2016) (citing *Coleman*, 501 U.S. at 729-30); *see also Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2062 (2017) ("Federal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear based on an adequate and independent state procedural ground."). "A dismissal pursuant to Article 11.071 'is an independent and adequate state ground for the purpose of imposing a procedural bar' in a subsequent federal habeas proceeding." *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)): *see also Sorto v. Davis*, 672 F. App'x 342, 348 (5th Cir. 2016). Because Russell did not present those claims to the state court in a procedurally adequate manner, this Court likewise cannot reach the merits unless he can overcome the procedural bar.

A petitioner has the burden to overcome a procedural bar. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). A petitioner meets this burden by showing: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Russell provides various arguments why this Court should reach the merits of his procedurally barred claims. The Court will discuss each argument in the relevant sections but

observes that Russell has not shown that federal review is available for any of his procedurally barred claims.

Russell exhausted claims four, seven, and eight on initial state habeas review. If an inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review. "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief." *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002). "[T]ime and again," the Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, ___ U.S. ___, 136 S. Ct. 456, 460 (2015) (quotation omitted). Under AEDPA's rigorous requirements, an inmate may only secure relief after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2).

To merit relief under AEDPA, a petitioner may not merely show legal error in the state court's decision. *See White v. Woodall*, 572 U.S. 415, 420 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA). AEDPA review exist only to "guard against extreme malfunctions in the state criminal justice systems . . . ." *Woods v. Donald*, ___ U.S. ___, 135 S. Ct. 1372, 1376 (2015) (quotation omitted). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was

so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 420 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court must also presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

With those standards in mind, the Court turns to the issues presented in Russell's federal petition.

## RUSSELL'S FEDERAL HABEAS CLAIMS

### I.    Sufficiency of the Evidence

Russell's first claim argues that the trial evidence was insufficient to support his conviction for capital murder in the course of committing retaliation. Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court affirms a jury's conviction if, considering all the evidence in a light most favorable to the prosecution, any rational trier of fact could have

returned a verdict unfavorable to the defendant.  Russell does not dispute that the jury correctly found him guilty of murder.  He instead argues that the State did not present sufficient evidence proving that he killed in retaliation, the predicate crime that made his a capital offense.  According to Russell, a correct understanding of Texas law outlining the crime of retaliation required the State "to show that [he] intentionally or knowingly harmed [the victim] as 'payback' for her action of identifying [him] to [an] undercover officer . . . as a potential seller of drugs." (Docket Entry No. 37 at 26).  Russell argues that "[t]here was no evidence that, at the time of the killing, Russell was acting with the intent to commit the underlying offense or knowledge that he was committing that offense."  (Docket Entry No. 37 at 26-27).

Russell did not litigate this claim during his initial round of appellate or habeas review in state court.  Russell first raised this issue in his federal habeas petition.  When he exhausted his claim during his successive state proceedings, the Court of Criminal Appeals refused to consider its merits under Texas' abuse-of-the-writ doctrine.  The state court ruling results in a procedural bar that forecloses federal review.  *See Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) ("A dismissal pursuant to Article 11.071 is an independent and adequate state ground for the purpose of imposing a procedural bar in a subsequent federal habeas proceeding.") (quotation omitted).  As discussed below, the Court finds that Russell cannot overcome the procedural bar.  Alternatively, Russell's first claim does not merit federal habeas relief.

A.     **Russell's Arguments to Overcome the Procedural Bar**

Russell makes three arguments to allow federal review: (1) Texas law generally does not bar an otherwise-procedurally-inadequate claim when a sentence is illegal; (2) he is actually innocent of capital murder; and (3) his prior state-court attorneys provided deficient performance in failing to advance an insufficiency claim.

### 1.    Illegal Sentence

In a somewhat convoluted argument, Russell asserts that the Court of Criminal Appeals held in *Ex parte McCuin*, 492 S.W.3d 33 (Tex. Crim. App. 2016) that "an illegal sentence may be challenged at any time," and thus not subject to constraints such as the abuse-of-the-writ doctrine. (Docket Entry No. 37 at 30; Docket Entry No. 54 at 12).   Russell argues that he received an illegal sentence because he did not commit the murder in retaliation, and thus the jury should not have convicted him for capital murder.  In essence, Russell asks this Court not to honor the procedural bar because the Texas courts should not have imposed it in the first place. Russell's argument, however, suffers from two fundamental deficiencies.  First, a "'basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default, if based upon an adequate and independent state ground.'"  *Smith v. Johnson*, 216 F.3d 521, 523 (5th Cir. 2000) (quoting *Barnes v. Thompson*, 58 F.3d 971 (4th Cir. 1995)); *see also Rowell v. Dretke*, 398 F.3d 370, 375 (5th Cir. 2005) ("It is not the role of the federal habeas court to reexamine state-court determinations of state-law questions.").   A "federal court may only inquire into whether cause and prejudice exist to excuse that default" but it may not ask "whether the state court properly applied its own law."  *Barnes*, 58 F.3d at 974. This Court cannot forgive the procedural bar by finding that the Texas courts should not have imposed it.

Second, Russell has not shown that the judgment in his case involves an illegal sentence. Russell is correct that "[t]here has never been anything in Texas law that prevented *any* court with jurisdiction over a criminal case from noticing and correcting an illegal sentence."  *Mizell v. State*, 119 S.W.3d 804, 806 (Tex. Crim. App. 2003).[7]  But the heart of Russell's argument, no

---

[7]     Despite that language, Texas has applied its abuse-of-the-writ jurisprudence to claims that involve an illegal sentence.  *See Ex parte Lee*, 2011 WL 1135914, at *1 (Tex. Crim. App. 2011).

matter how he characterizes it, does not implicate an illegal sentence. "A 'void' or 'illegal' sentence is one that is not authorized by law." *Ex parte Pena*, 71 S.W.3d 336, 336 n.2 (Tex. Crim. App. 2002); *see also Ex parte Seidel*, 39 S.W.3d 221, 225 n. 4 (Tex. Crim. App. 2001) ("[T]his Court has long held that a sentence is void when the punishment is unauthorized."). Texas generally considers a sentence illegal when it "is outside the maximum or minimum range of punishment . . .." *Mizell*, 119 S.W.3d at 806. In contrast, the heart of Russell's illegal-sentence arguments are merely re-characteriztions of his claim that the evidence did not satisfy the statutory requirements for his conviction. Russell has not shown that he is incarcerated under an illegal sentence.

### 2. Actual Innocence

Russell also argues that a "fundamental miscarriage of justice" requires this Court to overlook the state procedural bar. The fundamental-miscarriage-of-justice exception to the procedural bar doctrine requires an inmate to prove his actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 329 (1995). Russell makes his actual-innocence argument by rehashing the evidentiary picture that was before the jury and again arguing that the State did not prove retaliation. Russell, however, does not identify any new evidence that should have come before jurors. (Docket Entry No. 37 at 30). Simply, Russell merely recasts his insufficiency arguments as actual innocence.

Actual-innocence claims are distinct from claims of insufficient evidence. *See House v. Bell*, 547 U.S. 518, 538 (2006). An inmate claiming to be actually innocent must show that "new reliable evidence" exists which would have prevented a reasonable jury from finding him guilty. *See Schlup*, 513 U.S. at 329. This "gateway" to review of a procedurally barred claim "should open only when a petition presents 'evidence of innocence so strong that a court cannot have

confidence in the outcome of the trial . . . .'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup*, 513 U.S. at 316). Russell has not shown a miscarriage of justice because he has not provided any evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). Russell cannot overcome the procedural bar by rearguing his insufficiency-of-the-evidence claim as a fundamental miscarriage of justice.

### 3. *Ineffective State Habeas Representation*

Finally, Russell argues that, "to the extent state habeas counsel should have raised this point, the failure of state habeas counsel to raise an issue . . . can constitute cause and prejudice." (Docket Entry No. 37 at 32). In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court created a narrow exception to the procedural bar doctrine which "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim." *Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2062 (2017). This exception, however, only applies to defaulted ineffective-assistance-of-trial-counsel claims. *See id.* at 2064-75. The Court, therefore, finds that Russell's arguments cannot overcome the state-imposed procedural bar of this claim. The Court cannot reach the merits of Russell's first ground for relief.

### B.    **Alternative Review of the Merits**

Alternatively, the Court finds that Russell's insufficiency-of-the-evidence claim lacks merit. In assessing the sufficiency of the evidence, "federal habeas courts should independently analyze the governing statute, the indictment, and the jury charge to measure the constitutional sufficiency of the evidence and determine what are the essential elements required by the *Jackson* sufficiency inquiry." *Bledsue v. Johnson*, 188 F.3d 250, 260 (5th Cir. 1999). The federal constitutional issue in this case is "whether the evidence was constitutionally sufficient to convict [petitioner] of the crime charged." *Id.* at 262 (quoting *Brown v. Collins*, 937 F.2d 175,

181 (5th Cir. 1991)).  This demanding inquiry is highly deferential to, and resolves any conflicting evidence in favor of, the jury's verdict.  *See United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002); *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990).

Here, the jury instructions provided for Russell's conviction if he killed in the course of retaliation.  The jury instructions tracked Texas statutory law and defined the offense of retaliation: "if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a witness prospective witness or informant or a person who has reported or who the actor knows intends to report the occurrence of a crime."  Clerk's Record at 350; *see also* Tex. Penal Code § 36.06(a)(1).[8]  The trial court cautioned jurors to only find Russell guilty if the State proved retaliation beyond a reasonable doubt:

> Before you would be warranted in finding the defendant guilty of capital murder you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was in the course of committing or attempting to commit the felony offense of retaliation against Tanjala Brewer as alleged in this charge but also that the defendant specifically intended to cause the death of Tanjala Brewer by stabbing Tanjala Brewer with a deadly weapon namely a knife and unless you so find then you cannot convict the defendant of the offense of capital murder.

Clerk's Record at 352.

Russell frames his insufficiency-of-the-evidence claim as "an issue of statutory construction."  (Docket Entry No. 54 at 6).  Specifically, Russell argues that his conviction rests on a flawed understanding of what it means to be "in the course of" committing a crime, for the purposes of the capital murder statute.  According to Russell, a conviction for capital murder in the course of retaliation requires the State to prove that he "*set out to retaliate again*st [the

---

[8]     Under the *Jackson* standard, a court must refer to "the substantive elements of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324 n. 16.

victim]." (Docket Entry No. 54 at 10) (emphasis in original). Russell states that the murder "was a crime of passion, not a retaliatory killing." (Docket Entry No. 54 at 8). Russell seems to argue that, without some evidence that he "set out that night to commit Retaliation," the jury could not find him guilty of capital murder. (Docket Entry No. 37 at 27).

Russell has not pointed to any Texas law requiring that the actor form an intent to commit the underlying crime well before the murder, in this case requiring that the State prove that he intended to kill the victim when he went to her house. Texas statutory law does not define the phrase "in the course of committing or attempting to commit" as used in Section 19.03(a)(2). The Court of Criminal Appeals has defined the phrase to mean "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense." *Garrett v. State*, 851 S.W.2d 853, 856 (Tex. Crim. App. 1993); *see also Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980). The Texas courts have held that "[e]vidence is sufficient to support a capital murder conviction if it shows an intent" to commit the underlying offense "which was formed before or *contemporaneously* with the murder." *Shuffield v. State*, 189 S.W.3d 782, 791 (Tex. Crim. App. 2006) (emphasis added); *see also Reed v. Quarterman*, 504 F.3d 465, 489 (5th Cir. 2007) (explaining Texas law); *Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1982) (construing § 19.03(a)(2) "to mean conduct occurring in an attempt to commit, during the commission, or in immediate flight after the attempt or commission").

Viewing the evidence "in the light most favorable to the jury's verdict." *Jackson*, 443 U.S. at 319, the State argued that Russell, who faced a lengthy prison sentence, killed the victim for turning him into the police. The State based its case on Russell's statement in which he, as set out by the state habeas court, stated: "that he went to the [victim's] house the night of the

murder where they talked and smoked some drugs that the [victim] denied setting up" Russell. State Habeas Record at 516-17. Russell explained to the police: "And I was basically asking her saying you know Why did you set me up? Why did you set me up and she kept on denying it talking about I ain't set you up. I ain't set you up. Saying if you would have stayed with me none of this would have happened whatever. And basically what I'm saying I . . . just went off. I just snapped . . . ." Tr. Vol. 21, SX 1A at 2-4.[9]

True, the evidence did not unequivocally show that Russell went to the victim's house with the intention of killing her for having informed on him.[10] But Texas law only required the State to prove that Russell retaliated against the victim and that the intent to do so "was formed before or contemporaneously with the murder." *Shuffield v. State*, 189 S.W.3d 782, 791 (Tex. Crim. App. 2006); *see also Tucker v. State*, 771 S.W.2d 523, 528 (Tex. Crim. App. 1988).

Ms. Brewer had been an informant against Russell. The State had to show that "he killed her *because* of her status as such." *Angelo v. State*, 977 S.W.2d 169, 174 (Tex. App. Austin, 1998). "[A] plain reading of the statute requires the crime to have a retributory nature." *Id*. Russell may have been jealous as the jilted lover. "[T]here may have been several reasons why [he] wanted to kill [the victim]," but this Court's only concern is whether "the evidence viewed

---

[9] Russell disputes that he intended to retaliate against Ms. Brewer by arguing that he "had nothing to gain by punishing Brewer for 'setting up' Russell." (Docket Entry No. 37 at 27).

[10] The State separated the question of Russell's motive from his commission of retaliation:

> Now, Mr. Freed has gone into a lot about motive and what we have to prove in regard to motive. In this particular case, retaliation is what we have to prove that it was committed in the course of. So, there is kind of a connection as to why the offense was committed, but we never have to actually prove a motive and in the charge of murder, you would not see any element that requires us to prove an element of motive. Okay? You are going to see that in the Charge.

> So, if you find that a retaliation was being committed at the time that this complainant was murdered then you have found that a capital murder was committed by this defendant.

Tr. Vol. 18 at 26.

in the light most favorable to the verdict was sufficient for the jury to rationally conclude that [he] intentionally murdered [her] in the course of committing or attempting to commit . . . retaliation." *Brown v. State*, 2015 WL 5453765, at *8 (Tex. Crim. App. 2015). Russell's own words in his two police statements may provide context for deciding whether he killed in the course of retaliation. *See Stewart v. State*, 137 S.W.3d 184, 188 (Tex. App. Houston [1 Dist.], 2004) ("Retaliatory intent may be inferred from an accused's acts, words, or conduct.").

By the fact that both parties based their defense on differing interpretations of Russell's statement to the police, jurors could have come to different conclusions about his intent. That does not mean, however, that a rational jury could not interpret Russell's statements about how the victim informed on him as an indication of why he stabbed her seconds later. The Court cannot substitute any interpretation of the evidence witnesses in place of the fact finder. *See Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985). Because "[a]ll credibility choices and conflicting inferences are to be resolved in favor of the verdict," *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005), jurors could find beyond a reasonable doubt that Russell intentionally killed the victim while harming her on account of her informing against him, even if he formed the intent to retaliate against her contemporaneous to killing her. With the "highly deferential" review required by *Jackson*, *United States v. Hager*, 879 F.3d 550, 553 (5th Cir. 2018), the Court finds that, if fully available for federal review, Russell's insufficiency-of-the-evidence claim lacks merit.

## II.     Ineffective Assistance in Arguing that Russell Did Not Kill Out of Retaliation

Russell has raised various ineffective-assistance-of-counsel arguments in both state habeas court and in these proceedings. In his second ground for relief, Russell argues that counsel should have argued that "the State had categorically failed to prove that any killing

occurred 'while in the course of committing or attempting to commit Retaliation.'" (Docket Entry No. 37 at 34). Russell essentially argues that trial counsel should have advanced the same argument as in his first ground for relief: that the State did not legally prove he killed the victim in the course of retaliation.

## A.    *Strickland* Standard

Courts evaluate an attorney's efforts under the standard from *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

A court's review "of counsel's performance must be highly deferential," and made without "the distorting effects of hindsight." *Id.* at 689. Courts assess counsel's "challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because otherwise "[i]t is all too tempting for a defendant to second-guess counsel's assistance . . . ." *Id.* The law honors an attorney's "conscious and informed decision on trial tactics and strategy," allowing for federal relief only when "it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). The prejudice element requires the movant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

**B.      Procedural Bar**

Russell advanced his second claim for the first time in federal court, resulting in a procedural bar when he renewed it in his successive state habeas action.   Russell argues that his initial habeas counsel's failure to advance the claim forgives the procedural bar under *Martinez v. Ryan*, 566 U.S. 1 (2012).   The Fifth Circuit has summarized the rule announced in *Martinez* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit,"; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013) (quoting *Martinez*, 566 U.S. at 14). Russell must show that habeas counsel should have advanced a *Strickland* claim based on counsel's failure to craft a defense challenging the retaliation element of capital murder on legal grounds.

But trial counsel formulated a defense based on proving that Russell did not kill in retaliation.   Trial counsel explained the defense theory: "this was not a case of retaliation, it was a case of jilted and unfaithful love."   State Habeas Record at 510.   The defense made this theory a major and oft-repeated theme of trial.   The defense supported this theory with Russell's own testimony that "he snapped when [the victim] told him that she had sex with another man."   State Habeas Record at 510.   Russell's proposed focus on the statutory language in an effort to show that the killing was not in the course of retaliation differs little in substance or effect from the defense his attorneys put before jurors.   While Russell now wishes trial counsel had emphasized

other nuances, the basic argument he proposes is the same trial counsel presented at trial: there had been no retaliation.[11]

Counsel's choice in how to present a defense theory before jurors is strategy for which reviewing courts afford great deference. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage . . . . Judicial review of a defense attorney's summation is therefore highly deferential . . . .") "[I]ndulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, the Court cannot say that trial counsel's strategy was so ill-chosen to merit habeas relief, much less serious examination on post-judgment review. Accordingly, the Court finds that Russell has not shown that he can overcome any procedural bar because his claim has some merit or that failure to raise it prejudiced the defense. The Court cannot reach the merits of Russell's second ground for relief.[12]

## III. Ineffective Assistance of Appellate Counsel

In his third ground for relief, Russell claims that appellate counsel provided ineffective representation by failing to raise a claim challenging the sufficiency of the evidence proving retaliation. Specifically, Russell argues that appellate counsel should have raised an argument similar to the first ground for relief he raises in his federal petition. Russell, however, raised this claim for the first time in his initial federal petition, resulting in a procedural bar.

---

[11]      Trial counsel told jurors: "But the burden of proof is beyond a reasonable doubt for them to prove to you retaliation. They have to prove it to you at that level." Tr. Vol.18 at 24.

[12]      For the same reasons that he cannot show that his claim warrants review under *Martinez*, the Court finds that, if the merits were fully available for federal review, he has not shown *Strickland* error.

Russell argues that he can overcome the procedural bar by showing that the structure of Texas state habeas proceedings discourages inmates from advancing ineffective-assistance-of-appellate-counsel claims on state habeas review. According to Russell, because state appellate and habeas review proceed concurrently, attorneys appointed for each proceeding "[i]n theory . . . work together, each taking the issues properly assigned either to direct appeal or habeas review, although that is often not the case in practice." (Docket Entry No. 37 at 41). Russell argues that state habeas counsel's responsibility to advance *Strickland* claims against appellate counsel may damage that relationship and, effectively, discourage habeas counsel from advancing such claims.

Russell, however, has not provided any law or evidence supporting his argument that appellate and habeas attorneys must carry on a working relationship comparable to a defense team, that the structure of Texas review impedes *Strickland* claims because attorneys do not want to jeopardize that relationship, or that any concern about challenging another attorney's actions chilled the habeas representation in his case. Russell's arguments for cause only recognize the discomfort cause by *Strickland* claims in general, when one attorney may have to question the performance of a peer. Russell has not shown that he has cause to forgive raising his third ground for relief.

Nor can he show actual prejudice. The Court has considered the alternative merits of his first two grounds for relief, both of which traveled similar paths as this one. The Court found them to be without merit. Russell cannot show actual prejudice for counsel's failure to raise similar issues on direct appeal. The Court, therefore, finds that his third claim is procedurally barred.[13]

---

[13]     Alternatively, for the reasons discussed in his first two grounds for relief, claim three is without merit.

**IV. Ineffective Assistance of Assistance in Failing to Investigate and Present Evidence**

Russell's trial attorneys' strategy relied on his statement to the police as the centerpiece for the jealous-rage defense. Trial counsel placed it into context with Russell's own testimony. Russell explained that the victim had a relationship with Donald Ray Hawkins. Tr. Vol. 17 at 94. Russell testified that he had previously discovered the victim in a motel room with Hawkins. Tr. Vol. 17 at 94-95. Russell said that, on the night of the murder, he began arguing with the victim because she was using drugs she had obtained from Hawkins. Tr. Vol. 17 at 97-98. With that testimony, the defense tried to convince jurors that, when Russell arrived with a wedding ring at the victim's house, her relationship with Hawkins caused him to erupt in jealous fury. As trial counsel argued in closing, "at that moment, that absolute storm, she's killed. And it is tragic. It is terribly tragic. But the murder does not happen because she is a snitch. It happens out of jealously and rage and anger and emotions that are common." Tr. Vol. 18 at 21. Russell claims that trial counsel provided ineffective assistance because they did not bolster this argument by interviewing Hawkins before trial.

The defense knew about Hawkins, who was then incarcerated, well before trial. The trial investigator's notes indicate that Russell "admits that [the victim] was having an affair with Donald Ray Hawkins and that she was prostituting herself for drugs. . .. He frequently found [the victim] at Donald Ray's motel room and people used to tell him they saw the two hanging out on the street." State Habeas Record at 368. Russell told the investigator that "the testimony of Donald Ray Hawkins," among others, "was crucial." State Habeas Record at 368. Trial counsel ran a criminal history to learn information about Hawkins. State Habeas Record at 211, 378. Trial counsel's note included an entry "Donald Ray Hawkins – may need to bench warrant." State Habeas Record at 31. The defense, however, did not call Hawkins as a witness.

Russell raised a claim on state habeas review faulting trial counsel's efforts to support the jealousy defense. In doing so, Russell provided affidavits from people who could have described his jealous nature and otherwise supported his defense. The state habeas application, however, did not include an affidavit from Hawkins, or even specifically argue that trial counsel should have called him as a witness. State habeas counsel's proposed findings of fact and conclusions of law did not mention Hawkins specifically.

After the State responded to the habeas application, Russell filed a "Pro Se Motion for Amended Petition for State Writ of Habeas Corpus." State Habeas Record at 488. For the first time, Russell specifically argued that counsel provide ineffective assistance "for failing to call Donald Ray Hawkins as a witness at the time of trial" because "[h]is testimony was mandatory . . . to show [Russell's] relationship with [the victim] was the catalyst that resulted in this Crime of Passion." State Habeas Record at 488. Russell supported this putative claim with an affidavit from Hawkins. Hawkins described his "ongoing sexual relationship" with the victim "while [she] was still having sexual relations with" Russell. Hawkins would have expressed that he "would not have been having sexual relations with [the victim]" had he known that they were "still in a romantic relationship" because Russell "was a jealous person." Hawkins said: "Had I known that his jealously would have led to her death, I would have stopped our own sexual relations with each other." State Habeas Record at 492.

The state habeas court made explicit findings regarding the claim in the state habeas application filed by counsel:

> 61. The Court finds based on the credible affidavit of trial counsel Hayes that the defense theory of the case was to rebut the element of retaliation by showing that [Russell] and [Brewer] were involved in a relationship, but [Brewer] saw other men; that [Brewer] and [Russell] argued on the night of the offense, and [Russell] snapped when [Brewer] pulled a knife.

62. The Court finds that counsels' defensive theory was reasonable and was apparent at guilt-innocence, beginning with the opening statement, where trial counsel informed the jury that the evidence at trial would show that [Brewer] abused cocaine, and was involved with different men, including [Russell]; that the evidence would show that [Brewer] and [Russell] argued on the night of the offense; that [Brewer] pulled a knife and cut [Russell]; that [Russell] stabbed [Brewer] in return; and that [Russell] attempted suicide afterwards.

63. The Court finds that trial counsel continued the defense's consistent reasonable defensive theory by informing the jury during opening statement that "the evidence will show you that this is not a case of retaliation, that it is a case of jilted and unfaithful love."

64. The Court finds that the consistent reasonable defensive theory was present during the cross-examination of witnesses during guilt-innocence to elicit information concerning [Russell] and [Brewer's] relationship, [Russell's] alleged lack of knowledge that [Brewer] was a police informant, and the alleged circumstances of his statements to the police.

65. The Court finds that during the defense case-in-chief at guilt-innocence, trial counsel enlarged upon the consistent defensive theory by presenting the lengthy testimony of [Russell] avowing that he killed [Brewer] when he "snapped" after she told him that she had sex with another man.

66. The Court finds that the consistent defensive theory of counsel was apparent when trial counsel specifically informed the trial court during a bench discussion that counsel wanted to elicit evidence that [Brewer] evoked the same emotions and anger in other men as she did in [Russell].

State Habeas Record at 632-34 (citations omitted). The state court, however, did not rule on, or even discuss, the *pro se* application.

Russell's federal petition argues that trial counsel provided deficient representation by not interviewing Hawkins before trial. Russell faults counsel for not developing Hawkins' testimony, particularly that the killing was the result of "jealousy rage." State Habeas Record at 492. Respondent urges the Court not to consider the information in Hawkins' affidavit because Russell did not properly put it before the state courts. Further, Respondent argues that the Court should find this claim procedurally barred because Russell did not properly exhaust the

underlying basis for the claim.  (Docket Entry No. 47 at 52).[14]  The Court, however, does not reach those issues because Russell has not shown *Strickland* prejudice.

Trial counsel championed the jealousy defense on which Russell bases his fourth ground for relief.  The state habeas court considered whether trial counsel had adequately supported that defense, although it did not consider Hawkins' affidavit in doing so.  Hawkins' affidavit, however, does not contain any allegation that differs fundamentally from the trial defense. Hawkins' affidavit confirms that he was having a relationship with the victim and that Russell had a propensity toward jealousy.  The trial testimony, however, did not seriously dispute the fact that Hawkins and the victim had a relationship.  In his affidavit, Hawkins opines that Russell killed out of jealousy, but Hawkins was not there when Russell attacked the victim.  Hawkins' opinion of what motivated Russell in the moment he killed would likely not be admissible.

The jury, however, already had Russell's own explanation about why he killed.  While other witnesses could describe Russell's character and why he might have killed, only he could describe whether he did it out of retaliation or jealousy.  Trial counsel considered calling Hawkins as a witness and, for some reason not apparent from the record, decided not to do so. Still, Hawkins' testimony would not alter the information before the jury in any way that could create a reasonable probability of a different result.  Simply, Russell has not shown that trial counsel's failure to call Hawkins as a witness prejudiced the defense. The Court, therefore, will deny this claim.

---

[14]     Russell argues that "[t]he one missing piece of this puzzle" about why Hawkins did not testify at trial "is information from defense counsel as to *why* no investigation action was taken with respect to Hawkins."  (Docket Entry No. 37 at 45).  It is not correct to say that counsel did not make any investigation into Hawkins, but the record is unclear as to the extent of that investigation.  The record does not divulge why counsel did not call him as a witness.  Likely, the state habeas proceedings did not develop an answer to that question because Russell only raised it in an improper *pro se* pleading filed well after the State had answered his proper application.

## V.     *Brady*

Russell's fifth claim raises a procedurally barred argument that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by "fail[ing] to produce to defense counsel a ring, previously seized by the police, which might have reinforced both actual evidence and potential evidence indicating that [he] went to Brewer's house to make a romantic proposal, not for any retaliatory purpose . . . ."  (Docket Entry No. 37 at 47).  Russell's argument proceeds as if the defense was completely unaware of the ring at trial and that "the ring issue arose only after the state habeas review was complete . . . ."  (Docket Entry No. 37 at 51).  Russell's allegations have no merit.

Russell asks the Court to assume that the defense was unaware of the ring at trial, but the police seized that item from Russell himself.  The ring was an important trial issue mentioned by both the prosecution and the defense.  Trial counsel did not express any surprise at the ring but discussed it repeatedly before the jury.  Respondent's summary judgment motion amply identifies that "Russell inexplicably argues that the State suppressed favorable evidence that was actually admitted as a State's exhibit at trial."  (Docket Entry No. 47 at 61).

In response to the summary judgment motion, Russell transforms his argument into "fundamentally a discovery issue" because the ring was not turned over to the defense before trial.  (Docket Entry No. 54 at 25).  Russell does not identify any constitutional law requiring the prosecutor to turn over the possession of physical evidence, such as the ring, before trial.  Russell does not show how physical access to the ring would have made any difference to the defense's case or the jury's consideration of trial evidence.  Russell does not show that a *Brady* issue somehow exists because the ring before jurors as a State's exhibit.

Russell has not overcome the procedural bar of his *Brady* claim. Alternatively, his *Brady* claim is without merit.

## VI.   Prosecutorial Argument About Mitigating Evidence

Russell's sixth claim argues that the prosecutor violated Russell's constitutional rights during punishment-phase closing arguments by misguiding jurors on what evidence may be mitigating. Texas's special issues required jurors to answer whether "a sufficient mitigating circumstance or circumstances . . . warrant that a sentence of life imprisonment rather than a death sentence be imposed." Clerk's Record at 376. The trial court instructed jurors to "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness including evidence of the defendants background character or the circumstances of the offense that mitigates against the imposition of the death penalty." Clerk's Record at 370-71. Russell complains because the trial prosecutor told the jury that mitigating evidence is "something that might reduce or lessen his responsibility," but also said that "there is nothing wrong here that honestly and truly lessens this man's responsibility, his blameworthiness, his fault." Tr. Vol. 20 at 45. Russell objects that the prosecutor's language caused jurors only to consider mitigating evidence that reduced his culpability for the offense.

Russell did not raise this issue on appeal or during the first round of habeas review. Russell argues that he can overcome the resultant procedural bar of this claim because he bases his claim on law that developed after the conclusion of state post-conviction review. For decades, however, defendants have challenged the extent to which Texas juries could consider mitigating evidence. Russell's challenge to the State's argument is not so novel that any of his earlier attorneys could not have raised the same claim. Russell has not shown cause to overcome the procedural bar.

He has also not shown actual prejudice. While Russell claims that the prosecution limited the jury's consideration only to mitigating evidence that bore a relationship with the crime, a broader look at the prosecutor's argument reveals no such limitation. The State argued:

> I can't tell you what's mitigating. It's up to you. I suggest to you there is nothing mitigating in this case. Our Charge tells you that mitigating evidence is something that you believe may reduce the defendant's moral blameworthiness. In other words, something that might reduce or lessen his responsibility. Name one thing that you have heard during this trial that lessens his responsibility for brutally murdering that woman. One thing. There is none.

Tr. Vol. 20 at 45. The prosecutors told jurors that they could decide what amounted to mitigating evidence. The jury instructions likewise broadly allowed for the jury to exercise full discretion in applying any mitigating evidence. The Court finds that Russell has not shown cause or prejudice to overcome the procedural bar of his sixth ground for relief.[15]

## VII. Ineffective Assistance in the Investigation and Presentation of Mitigating Evidence

Russell claims that his trial attorneys provided deficient performance in developing and presenting evidence for the jury to answer Texas' mitigation special issue. Russell exhausted this claim in state habeas court. The state habeas court's adjudication of this claim began by acknowledging that "the defense prepared and filed pre-trial motions interviewed witnesses, obtained discovery from the State, reviewed the State's file, talked to [Russell] numerous times about the offense and pending trial, retained a mitigation specialist, talked to [Russell's] family and talked [to Russell] about his background and life" State Habeas Record at 519. With that background, the defense formed a "reasonable, coherent theory of mitigation: [Russell] was essentially a good person who was adversely affected by his environment and influences on him and the instant offense was an aberration of [his] character." State Habeas Record at 524. This mitigation strategy "centered on the effects of [Russell] being raised among drug dealing and

---

[15] Alternatively, the Court has reviewed the merits of his claim and, for similar reasons as discussed above, finds that it is without merit.

violence in the Fifth Ward, being abandoned by his father, having a family history of crime with relatives in prison, having a mother who had to work at two jobs and get food stamps, and [Russell] being a good person who did not have much of a chance." State Habeas Record at 519-20. Trial counsel put that defense before jurors through the testimony of ten friends and family members including his mother, two siblings, two aunts, two uncles, and his friends. State Habeas Record at 520. The state habeas court extensively discussed the detailed testimony that filled in the outline drawn by the defense's strategy. State Habeas Record at 520-24.

Russell, however, claimed in his state habeas application that counsel was deficient in preparing a punishment-phase case. State habeas counsel interviewed individuals who knew Russell, many of whom had testified at his trial, and obtained affidavits from them describing Russell's background. State habeas counsel gave the affidavits to Dr. Mark Cunningham, a psychologist who often appears as an expert witness in capital cases. Dr. Cunningham reviewed the trial, the new affidavits, and record evidence. Dr. Cunningham prepared a report with the conclusions he derived from his review.

With that background, Russell claimed that trial counsel did not present an adequate punishment defense. Russell based his *Strickland* claim on a list of "adverse developmental factors" he experienced, as listed by Dr. Cunningham: generational family dysfunction, mother's teenage status at outset of childbearing, father abandonment, learning disabilities attention and concentration problems and school failure, bullied by peers, child neglect, inadequate parental supervision and guidance with mother's acceptance of drug trafficking proceeds, corruptive influence of extended family, chronic poverty, alcoholism of stepfather, chronic emotional estrangement and hostility in relationship of mother and stepfather, corruptive community influences, teen onset drug trafficking, community violence exposure with gunshot victimization

and victimization of family, evidence of severe psychological disorder, pathological relationship with Tanjala Brewer.  State Habeas Record at 65-66.

Contrasting Russell's habeas evidence against that presented at trial, the state habeas court found that "trial counsel presented essentially the same evidence at punishment that [Russell] now contends should have been presented: generational family dysfunction, economic deprivation, [Russell's] mother's age of seventeen at the time of [his] birth, [his] father's abandonment, [his] teenage drug dealing, and community violence."  State Habeas Record at 525.  The state habeas court recognized that Dr. Cunningham's affidavit exceeded the scope of the trial evidence by alleging marital discord among Russell's parents, a home plagued by neglect, childhood hyperactivity, and a possible psychological disorder.  The state habeas court, however, found Dr. Cunningham's affidavit "unpersuasive" and his conclusions "far-reaching" because the trial evidence directly contradicted many of his opinions.  State Habeas Record at 525-26.[16]  Also, the state habeas court endorsed trial counsel's belief that "specific evidence of [Russell's] life and background, such as the evidence the defense presented to the jury, would be more effective that studies of convicted murderers."  State Habeas Record at 526.

With that understanding, the state habeas court found that "counsel cannot be ineffective": (1) for "choosing to present mitigation evidence in a different manner than others"; (2) when "the presented evidence [is] essentially the same as the evidence [Russell] now complains should have been presented"; (3) for not presenting "a reasonable coherent theory of mitigation" when it actually presented a "apparent, predominate, and coherent" theme similar to that alleged on habeas review; (4) not presenting the "less-than authoritative and far-reaching" testimony of Dr. Cunningham; and (5) not "presenting evidence that undermines and is at odd

---

[16]     A federal court has reached similar conclusions about similar testimony by Dr. Cunningham, finding that "his testimony would seem hollow-and even unbelievable . . . ."  *United States v. Bourgeois*, 2011 WL 1930684, at *60 (S.D. Tex. 2011).

with the presented mitigation strategy." State Habeas Record at 532-33. In sum, the state habeas court found that counsel was not deficient in the preparation or presentation of evidence.

In his federal petition, Russell relies on the same evidence he presented in state court to allege ineffectiveness in defending against a death sentence. Russell acknowledges that this Court must defer to the state court's findings and conclusions. Federal consideration of ineffective-assistance claims that the state courts have resolved on the merits marries two forgiving standards: AEDPA deference to the integrity of state court judgments and *Strickland*'s deference to counsel's decisions. While "[s]urmounting *Strickland*'s high bar is never an easy task," a habeas petitioner's duty to "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and § 2254(d) are both highly deferential, . . . and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citation omitted); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Together, these standards create a "doubly" deferential review that allows a state decision to stand if there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

Russell's federal petition does not dispute the state habeas court's findings and conclusions, other than to argue that counsel should have presented additional mitigating evidence because the prosecutor had urged jurors to find a nexus between the evidence and the charged offense. The essence of Russell's argument is that trial counsel should have "beefed up" the mitigation defense. (Docket Entry No. 37 at 61). Courts, however, are disinclined to find *Strickland* error because counsel could have done more. Arguments such as that made by Russell "come down to a matter of degrees" which is particularly susceptible "to judicial second-

guessing." *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000). The Fifth Circuit has refused to find *Strickland* error when trial counsel presented the jurors with similar mitigating evidence, even if another attorney would have done so differently or more fully. S*ee Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006); *Alexander v. Quarterman*, 198 F. App'x 354, 359-60 (5th Cir. 2006); *Parr v. Quarterman*, 472 F.3d 245, 257–58 (5th Cir. 2006).

The state habeas court issued specific factual findings relating to Dr. Cunningham's affidavit, stating that his opinions were not credible or believable. Russell has not overcome the presumption of correctness afforded those findings. 28 U.S.C. §2254(e)(1). Importantly, basing a claim on Dr. Cunningham's affidavit and arguing that counsel should have presented "more accurate and stronger arguments" against a death sentence "is simply an argument for a different strategy . . .." *King v. Davis*, 703 F. App'x 320, 330 (5th Cir. 2017). Counsel developed a strategy to present a mitigating case that largely only differed in detail from that on which Russell bases his *Strickland* claim. Perhaps counsel could have presented a more-robust case, but "the test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995). With the doubly deferential standard afforded the state court adjudication of *Strickland* claims, Russell has not shown that the state court's rejection of his sixth claim was contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). This claim is denied.

## VIII.    Ineffective Assistance Regarding Evidence of Russell's Future Threat to Society

Russell's eighth claim argues that trial counsel deficiently prepared a case for a favorable answer to Texas' future-dangerousness special issue. On state habeas review, Russell claimed that trial counsel failed to present any evidence that would rebut the State's argument that he

would be a future societal danger. Russell argued that counsel should have presented the jury with information similar to that contained in a report from Dr. Cunningham. Dr. Cunningham would have testified concerning factors that predict violence in prison and his research in capital sentencing. State Habeas Record at 52-117. Dr. Cunningham also would have provided testimony about the threat posed by capital inmates generally, and that posed by Russell given his background and discrete characteristics.

Russell raised this claim in conjunction with his claim involving mitigating evidence. Russell did not provide extensive briefing on this claim when he raised it in state court. On state habeas review, Russell primarily used Dr. Cunningham's report to support his claim that trial counsel ineffectually presented mitigating evidence. In a single paragraph under his general ineffectiveness-at-the-penalty-phase claim with the subheading entitled "The Case Against Future Danger," however, Russell stated that "the defense failed to rebut or describe how inaccurate past violence in the free world serves as a predictor of violence while incarcerated. Cunningham notes countless studies of little predictive value past conduct can serve. Finally, the defense failed to individualize Mr. Russell's violence risk from rates of violence among convicted murderers in Texas prisons." State Habeas Record at 22.

Russell now states that his state habeas application "raised, based on Cunningham's work regarding future dangerousness" a claim for which "[n]othing . . . appeared in the findings of daft and conclusions of law . . . ." (Docket Entry No. 37 at 66). To the contrary, the state habeas court's recommendation discusses the use of Dr. Cunningham's report, but follows the format of Russell's habeas application and does so in the context of his general *Strickland* claim. The state habeas court made specific findings about Dr. Cunningham's report:

> The Court finds that studies of future dangerousness of convicted Texas murderers are not relevant to the question of [Russell's] future dangerousness as

they do not address [his] characteristics, circumstances, or individual propensity for committing future acts of violence as evaluated by the applicant's jury based on the evidence.

The Court finds based on the credible affidavit of trial counsel Hayes that counsel believes that specific evidence of [Russell's] life and background such as the evidence the defense presented to the jury would be more effective than studies of convicted murderers.

State Habeas Record at 631.[17]

Russell does not acknowledge the state court findings to which this Court must defer, much less show by clear and convincing evidence that they are incorrect.  At its heart, Russell's argument is simply that counsel should have adopted a different strategy at the penalty phase.  A reasonably attorney could come to the conclusion that academic discussion about crime statistics could be less effective than lay testimony, and in fact could weaken that testimony.  The Court finds that Russell has not shown that the state habeas court's rejection of this claim was contrary to, or an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).  This claim is denied.

## IX.     Denial of a Hearing on State Habeas Review

In his ninth ground for relief, Russell argues that the state habeas court violated his constitutional rights by not holding a hearing in which his expert Dr. Cunningham could testify. Russell did not raise this claim in state court and has not overcome the resultant procedural bar. Even if the Court could reach the merits of his claim, however, "errors in state postconviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief."  *Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999); *see also Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995).  The Court summarily denies claim nine.

---

[17]     Counsel opined that "specific evidence of the defendant's life and background, such as [was] presented to the jury, would have had more effect than studies of violence among convicted murderers."  State Habeas Record at 510-11.

# CERTIFICATE OF APPEALABILITY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA"). *See* 28 U.S.C. § 2253(c). Russell has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 482 (2000). The Fifth Circuit anticipates that a court will resolve any questions about a COA in the death-row inmate's favor. *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484; *Miller-El I*, 537 U.S. at 336-38. On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484; *Miller-El I*, 537 U.S. at 336-38. Unless the prisoner meets the COA standard, "no appeal would be warranted." *Slack*, 529 U.S. at 484.

Having considered the merits of Russell's petition, and in light of AEDPA's standards and controlling precedent, this Court determines that a COA should not issue on any claim.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Respondent's motion for summary judgment (Docket. No. 47) and **DENIES** Petitioner Pete Russell, Jr.'s Petition for Writ of Habeas Corpus **WITH PREJUDICE**. All outstanding motions are otherwise **DENIED**. A Certificate of Appealability is **DENIED** with respect to all claims.

It is so ORDERED.

SIGNED on this 23rd day of July, 2019.

_____
Kenneth M. Hoyt
United States District Judge